## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LOWER SUSQUEHANNA RIVERKEEPER ASSOCIATION, | ) ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) | Civil Action No. _____ |
| J&K SALVAGE, INC., | ) ) ) | |
| *Defendant.* | ) ) ) ) | |

## COMPLAINT

Plaintiff, Lower Susquehanna Riverkeeper Association ("the Riverkeeper"), by and through its attorneys, Chesapeake Legal Alliance, files this Complaint alleging the following:

## STATEMENT OF THE CASE

1.      This is a citizen suit for declaratory and injunctive relief, the assessment of civil penalties, Plaintiff's cost of litigation and response costs, and other appropriate relief against Defendant, J&K Salvage, Inc. ("Defendant" or "J&K Salvage") for violations of the Clean Water Act, 33 U.S.C. § 1251, *et seq.* ("CWA"), the Resource Conservation and Recovery Act, 42 U.S.C. §

6972(a)(1)(B), *et seq.* ("RCRA"), and the Pennsylvania Clean Streams Law, 35 P.S. § 691.1, *et seq.* ("Clean Streams Law")*.*

2.      These violations occurred and are occurring at J&K Salvage's metal shredding facility and scrap yard located at 1099 Kings Mill Road York, Spring Garden Township, York County, Pennsylvania, 17403-3485 (the "Facility").

3.      J&K Salvage advertises itself as York County, Pennsylvania's only shredding facility and premier recycler of ferrous and non-ferrous metals.[1] Its shredder can process 300 automobiles daily and up to 5,000 tons of material monthly.[2] The site also offers materials storage.[3] The scrap yard receives aluminum, copper, steel, and various other materials.[4]

4.      The Facility borders Codorus Creek, a tributary of the Susquehanna River.

5.      The Commonwealth of Pennsylvania's Department of Environmental Protection ("PADEP") is authorized to administer the CWA's National Pollutant Discharge Elimination System ("NPDES") permitting program. *See* 33 U.S.C. §

---

[1] J&K Salvage Home Page, https://salvage.jksalvageco.com/ (last visited July 8, 2025).
[2] *Id.*
[3] *Id.*
[4] *Id.*

1342; *see also* Memorandum of Agreement Between the Commonwealth of Pennsylvania and the United States Environmental Protection Agency (1991).[5]

6.      PADEP issued NPDES Permit No. PAS603505 (the "Permit") to J&K Salvage, effective December 1, 2019, which authorized outfalls 001, 002, and 004 of the Facility to discharge to Codorus Creek, and outfall 003 to discharge into an Unnamed Tributary of Codorus Creek.

7.      The Permit expired on November 30, 2024.

8.      As described further below, Defendant discharged and continues to discharge pollutants into the Lower Susquehanna River watershed outside of the scope of their expired Permit, including heavy metals, Per- and Polyfluoroalkyl Substances ("PFAS"), and various volatile organic compounds.

9.      As of the date of filing this Complaint, Defendant continues to operate the Facility without an NPDES permit after its Permit expired on November 30, 2024.

10.     On January 27, 2025, Defendant provided a letter to PADEP in response to multiple Notices of Violation ("NOV") in which Defendant acknowledged that the Facility was operating without a permit and intended to continue illegally operating the Facility.

---

[5] *Available at*
https://www.epa.gov/sites/default/files/2013-09/documents/pa-moa-npdes.pdf (last visited July 10, 2025).

11.     Defendant violated and is continuing to violate federal law by discharging unauthorized pollutants into the Lower Susquehanna River watershed.

12.     PADEP has previously found the Facility in noncompliance with state solid waste management laws and permits.

13.     Testing of the water and soil adjacent to the Facility by the Riverkeeper shows that the Facility is likely contaminating nearby soils, wetlands, and Codorus Creek.

14.     Plaintiff brings this action pursuant to the citizen suit provisions of CWA, 33 U.S.C. § 1311(a) and § 1365(a)(1)(A), *et seq.*, RCRA, 42 U.S.C. § 6972(a)(1)(B), and the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq.*

15.     Plaintiff seeks civil penalties, Plaintiff's attorney's fees and costs of litigation, declaratory and injunctive relief, and any other appropriate relief from the Court to address the violations of CWA, RCRA, and violations of the Pennsylvania Clean Streams Law, 35 P.S. § 691.1, *et seq.*

## <u>JURISDICTION AND VENUE</u>

16.     This Court has subject matter jurisdiction over this action and the Parties pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331 & 1367(a).

17.     Pursuant to 33 U.S.C. § 1365(c) and 42 U.S.C. § 6972(a), venue is proper in this District because the violations of CWA, RCRA, and the Pennsylvania

Clean Streams Law, 35 P.S. § 691.1, *et seq.*, alleged in this Complaint occurred and continue to occur in this District.

18.    On March 31, 2025, Plaintiff sent a notice of intent to sue ("NOI") for violations of CWA, RCRA, and the Pennsylvania Clean Streams Law to the statutorily-required parties pursuant 33 U.S.C. § 1365(b)(1)(A) and 42 U.S.C. § 6972(a)(1)(B). *See* Exh. 1, Lower Susquehanna Riverkeeper Association NOI.

19.    Pursuant to the CWA, 33 U.S.C. § 1365(b)(1)(A) (requiring 60-day notice), Plaintiff gave notice more than 60 days prior to commencing this action to all required parties, including J&K Salvage.

20.    Pursuant to RCRA, 42 U.S.C. § 6972(b)(2) (requiring 90-day notice), Plaintiff gave notice more than 90 days prior to commencing this action to all required parties, including J&K Salvage.

21.    No bar to citizen enforcement exists. Neither EPA nor the Commonwealth of Pennsylvania has commenced or is diligently prosecuting a civil or criminal action against Defendant in a court of the United States or of the Commonwealth of Pennsylvania, or is pursuing an administrative penalty action, to require compliance with the laws, rules, regulations, permits, standards, or limitations at issue in this case. 33 U.S.C. § 1365(b)(1)(A), (B); 42 U.S.C. § 6972(b)(2)(B), (C).

**PARTIES**

22.    Plaintiff is a 501(c)(3) nonprofit organization formed in 2007. The Riverkeeper is headquartered at 338 South Front Street, Wrightsville, Pennsylvania. The Riverkeeper is dedicated to improving and protecting the ecological integrity of the Susquehanna River watershed and Chesapeake Bay by identifying sources of pollution and enforcing environmental laws. Its mission is to ensure drinkable, fishable, and swimmable water and raise community awareness for current and future generations on the ecological and economic value of the Lower Susquehanna River watershed. The Riverkeeper monitors over 8500 square miles of the Lower Susquehanna River watershed.

23.    The Riverkeeper has over 500 members who utilize the Susquehanna River watershed, including the Lower Susquehanna River and Codorus Creek, for numerous purposes, including recreational, aesthetic, and economic uses. For example, members kayak, swim, and fish in these waterways.

24.    The Riverkeeper is also a member of the Waterkeeper Alliance, a global alliance of Waterkeeper programs.

25.    The Riverkeeper works with its members and other organizations by utilizing the CWA and other environmental laws to stop pollution that threatens public health, impairs water quality, damages ecosystems, and negatively impacts the ability of its members to use and enjoy the waterways within the Lower

Susquehanna River watershed. The Riverkeeper's members include individuals who live close to and downstream of J&K Salvage and on Codorus Creek. These members are concerned about the heavy metal and PFAS pollution flowing down from the Facility that harms their ability to use and enjoy Codorus Creek and the Lower Susquehanna River. *See* Declarations of Ted Evgeniadis and Mark D. Lentz, attached as Exhibit 2a and 2b.

26.    An organization has Article III standing to sue on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

27.    The Riverkeeper's members have been harmed by the violations alleged in this Complaint. Pollution from the Facility threatens public health, impairs water quality, and degrades the ecosystems in and around Codorus Creek. Defendant's violations of the CWA, RCRA, and Pennsylvania state law have resulted in excess pollution, which contributes to unsafe recreational and living conditions in Codorus Creek and the Lower Susquehanna River. Defendant's violations have also diminished the Riverkeeper's members' use and enjoyment of these waters by preventing use of, and recreation on and around them in the future. Furthermore, Defendant's illegal discharges and improper handling, storage,

treatment, transportation, or disposal of solid waste present an imminent and substantial endangerment to human health and the environment, and thereby adversely affect the recreational, aesthetic, environmental, and other interests of the Riverkeeper's members.

28.    The injuries suffered by the Riverkeeper and its members as a result of Defendant's actions would be redressed by a declaratory judgment that Defendant is in violation of the CWA, RCRA, and the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq.*; an injunction preventing Defendant from further violating these laws and the expired NPDES Permit; an Order requiring Defendant to assess and remediate the harm caused by its violations; and imposing civil penalties and the costs of litigation, including Plaintiff's attorney's fees and costs.

29.    A favorable decision in this matter would compel Defendant to comply with applicable permits and laws and ensure that the operation of the Facility does not continue to negatively impact the water and soil quality in and around Codorus Creek and the Lower Susquehanna River; would lead to improvements in water and soil quality; and would redress the concerns of Plaintiff's members.

30.    The interests that Plaintiff seeks to protect are germane to its organizational purposes.

31.    Neither the claims asserted, nor the relief requested, require the participation of the individual members of the Riverkeeper in this action.

32.    At all relevant times, Plaintiff was and is a "person" within the meaning of CWA, 33 U.S.C. § 1362(5) and RCRA, 42 U.S.C. § 6903(15).

33.    J&K Salvage is a Pennsylvania registered fictitious name owned by Joe Darrah, Inc.

34.    Defendant J&K Salvage is incorporated in Pennsylvania and its headquarters is located in Pennsylvania.

35.    J&K Salvage is a "person" within the meaning of CWA, 33 U.S.C. § 1362(5) and RCRA, 42 U.S.C. § 6903(15).

## STATUTORY AND REGULATORY FRAMEWORK

36.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as an NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

37.    The term "discharge of pollutants" is defined in Section 502(12) of the CWA, 33 U.S.C. § 1362(12), to mean "any addition of any pollutant to navigable waters from any point source . . .."

38.    The term "pollutant" is defined in Section 502(6) of the CWA, 33 U.S.C. § 1362(6), to mean "dredged spoil, solid waste . . . sewage . . . sewage

sludge . . . chemical wastes, biological materials . . . and industrial, municipal . . . waste discharged into water."

39.    The term "point source" is defined in Section 502(14) of the CWA, 33 U.S.C. § 1362(14), to mean "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged."

40.    The term "navigable waters" is defined in Section 502(7) of the CWA, 33 U.S.C. § 1362(7) to mean "the waters of the United States, including the territorial seas."

41.    Section 502(5) of the CWA, 33 U.S.C. § 1362(5), defines the term "person" to mean an "individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body."

42.    Section 402(a) of the CWA, 33 U.S.C. § 1342(a), provides that the EPA may issue NPDES permits to "persons" that authorize the discharge of any pollutant into navigable waters, but only in compliance with Section 301 of the CWA, 33 U.S.C. § 1311, and such other conditions as EPA determines are necessary to carry out the provisions of the CWA.

43.    Section 402(b) of the CWA, 33 U.S.C. § 1342(b), provides that a State may establish its own permit program and, after receiving approval of its program by the EPA, issue NPDES permits.

44.    The Administrator of EPA authorized the PADEP, pursuant to Section 402(a)(2) of the CWA, 33 U.S.C. § 1342(a)(2), to issue NPDES permits on June 30, 1978. 52 Fed. Reg. 3701. The applicable Pennsylvania law for issuing NPDES permits is the Clean Streams Law, 35 P.S. § 691.1 *et seq*.

45.    40 C.F.R. § 122.41(a) states that permittees "must comply with all conditions of [their NPDES] . . . permit. Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action . . . ."

46.    Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), allows citizens to bring suit against "any person . . . alleged to be in violation" of an "effluent standard or limitation" established under the CWA or "an order issued by . . . a State with respect to such a standard or limitation."

47.    CWA Section 505(f)(7), 33 U.S.C. § 1365(f)(7), defines "effluent standard or limitation" as "a permit or condition of a permit issued under Section 402 [33 U.S.C. § 1342]." A NPDES permit, and any limitations or conditions contained in that permit pertaining to any discharge or potential discharge from the facility covered by the permit, are "effluent standard[s] or limitation[s]" as defined by Section 505(f)(7) of the CWA.

48.     In an action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order a defendant to comply with the CWA and to assess civil penalties.

49.     Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

50.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), provides that any person who violates, *inter alia*, Section 301 of the CWA, 33 U.S.C. § 1311, or who violates any condition or limitation of a NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, shall be subject to a civil penalty.

51.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, any person who violates Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, shall be subject to a civil penalty up to $68,445 per day per violation occurring on or after January 13, 2009. *See also* 40 C.F.R. § 19.4 for violations that occurred after November 2, 2015, where penalties are assessed on or after January 8, 2025. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (Table 1 – Civil Monetary Penalty Inflation Adjustments).

52.    RCRA authorizes any person to "commence a civil action . . . against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

53.    RCRA defines "person" to include an "individual," "corporation," "partnership," or "association," in addition to other terms. 42 U.S.C. § 6903(15).

54.    RCRA defines solid waste as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . . ." 42 U.S.C. § 6903(27).

55.    Under RCRA, any action brought under 42 U.S.C. § 6972(a) "shall be brought in the district court for the district in which the alleged violation occurred or the alleged endangerment may occur . . . ." 42 U.S.C. § 6972(a).

56.    The district court has jurisdiction, "without regard to the amount in controversy or the citizenship of the parties, . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" which may present an imminent and substantial endangerment to health or the environment,

and "to order such person to take such other action as may be necessary, or both . . . , and to apply any appropriate civil penalties . . . ." 42 U.S.C. § 6972(a).

57.    Defendants are subject to civil penalties of up to $124,426 per day, per violation that occurred after November 2, 2015, where penalties are assessed on or after January 8, 2025. 42 U.S.C. §§ 6972(a), 6928(a) and (g); 40 C.F.R. 19.4 (Table 1 - Civil Monetary Penalty Inflation Adjustments).

58.    Pursuant to Section 7003 of RCRA, the court "may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate." 42 U.S.C. § 6972(e).

## FACTUAL BACKGROUND

59.    The Facility is bordered by Codorus Creek and has four outfall points where stormwater runoff discharges into Codorus Creek.

60.    The Environmental Protection Agency's ("EPA") Enforcement and Compliance History Online website ("ECHO") reports that this Facility is located in an area with a low income and high minority population that is overburdened by pollution sources as compared to the rest of Pennsylvania.

61.    The Permit was issued by PADEP pursuant to § 402 of the CWA, 33 U.S.C. §1342(b). The Permit required the Facility to discharge any materials in accordance with certain effluent limitations, monitoring requirements, and other

conditions set forth in the Permit. The Permit only authorized discharge from outfalls 001, 002, 003, and 004. Outfalls 001, 002, and 004 were authorized to discharge into Codorus Creek and outfall 003 was authorized to discharge into an unnamed tributary of Codorus Creek, which flows immediately into Codorus Creek. All four outfalls are pipes and qualify as point sources under the CWA. 33 U.S.C. § 1362(14).

*Codorus Creek*

62.    The Facility's outfalls discharge pollutants into both Codorus Creek and an unnamed tributary of Codorus Creek. The Codorus Creek watershed encompasses 278 square miles of drainage area. Codorus Creek flows into the Lower Susquehanna River.

63.    Codorus Creek and its tributaries are utilized by the public for multiple purposes, the primary use being fishing. Both waterways are also designated for use in Water Contact Sports.

*The Permit*

64.    The Permit establishes, among others, the following effluent limits:

a.  Total Oil and Grease: 30 mg/L Instant Max;

b.  Dissolved Iron: 7 mg/L Instant Max; and

c.  pH: 6 mg/L Instant Minimum and 9 mg/L Instant Max.

65.    The Permit also contains monitoring and reporting requirements for Chemical Oxygen Demand, Total Suspended Solids, Aluminum, Cadmium, Chromium, Copper, Iron, Lead, Manganese, Mercury, Nickel, Zinc, and Acetone.

66.    Additionally, the Permit prohibits the discharge of "floating solids, scum, sheen or substances that result in observed deposits in the receiving water" pursuant to 25 Pa. Code § 92a.41(c), and "oil and grease in amounts that cause a film or sheen upon or discoloration of the waters of . . . [the] Commonwealth [of Pennsylvania] or adjoining shoreline, or that exceed 15 mg/l as a daily average or 30 mg/l at any time (or lesser amounts if specified in this permit)", pursuant to 25 Pa. Code § 92a.47(a)(7) and § 95.2(2). NPDES Permit PAS603505 10.

67.    The Permit also prohibits "substances in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life" pursuant to 25 Pa. Code § 93.6(a); and "foam or substances that produce an observed change in the color, taste, odor or turbidity of the receiving water, unless those conditions are otherwise controlled through effluent limitations or other requirements in this permit", pursuant to 25 Pa. Code § 92a.41(c). NPDES Permit PAS603505 10.

68.    Defendant was required to submit timely and accurate quarterly Discharge Monitoring Reports ("DMRs") verifying compliance with the effluent limits. NPDES Permit PAS603505 13–14.

69.    The Permit also contains numerous management requirements that establish enforceable Facility operation procedures. NPDES Permit PAS603505 17–18.

70.    Management Requirement I(D) states that "[t]he permittee shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by the permittee to achieve compliance with the terms and conditions of this permit." NPDES Permit PAS603505 17.

71.    Management Requirement I(E) states that "[t]he permittee shall take all reasonable steps to minimize or prevent any discharge in violation of this permit that has a reasonable likelihood of adversely affecting human health or the environment." NPDES Permit PAS603505 17.

72.    The Permit requires J&K Salvage to implement and maintain several Best Management Practices ("BMPs"), including exposure minimization, routine cleaning, appropriate materials storage, proper care and disposal of scrap residual fluids, and minimizing contact of scrap and waste material stockpiles and storage with stormwater. NPDES Permit PAS603505 21–25.

73.    The Permit establishes "civil, administrative and/or criminal penalties" for violations of Permit Conditions, the CWA, and rules, regulations, or orders of PADEP. NPDES Permit PAS603505 18.

74.    The Permit only authorizes discharges from outfalls 001, 002, 003, and 004.

75.    Outfalls 001 and 002 contain oil/water separators prior to discharging the contents into Codorus Creek. Outfall 003 contains an oil/water separator prior to discharging into an unnamed tributary of Codorus Creek. Outfall 004 contains a High Density Polyethylene-lined basin and discharges into Codorus Creek.

***Unpermitted Discharges***

76.    The Permit that governed the Facility's discharges places limits on the discharge of certain pollutants and monitoring and reporting requirements on others. Pollutants not listed in the Permit are not authorized to be discharged from the Facility.

77.    Beginning on February 2, 2022 through at least October 3, 2024, the Facility discharged unpermitted pollutants from Outfalls 001, 002, 003, and 004 into Codorus Creek and an unnamed tributary of Codorus Creek; including non-permitted pollutants and excessive levels of permitted pollutants.

78.    Based on knowledge, information, and belief, the Riverkeeper has identified multiple discharges that have occurred at the Facility in violation of the expired Permit.

79.    On February 2, 2022, the Riverkeeper sampled Codorus Creek immediately downstream of the Facility's outfalls site and identified 2.1 mg/liter of

Boron, 0.0044 mg/liter of Cobalt, and 0.059 mg/liter Lithium. These pollutants were not detected in Codorus Creek on the same day *upstream* of the Facility and it is likely these unpermitted pollutants entered Codorus Creek from point sources at the Facility. The Facility is not permitted to discharge any Boron, Cobalt, or Lithium to Codorus Creek from its operation.

80.    Additionally, on February 22, 2022, the Riverkeeper sampled water below a permitted discharge pipe that was actively discharging into Codorus Creek. The sampling identified discharges of multiple pollutants either unpermitted or exceeding the permitted effluent limit. These discharges included 29.9 mg/liter of Iron (in excess of the effluent limit of 7 mg/L), 0.014 mg/liter of Arsenic, 0.78 mg/liter of Boron, 0.017 mg/liter of Cobalt, and 1.1 mg/liter of Nitrate.

81.    On March 3, 2022, the Riverkeeper sampled a permitted discharge pipe from the Facility that was actively discharging into Codorus Creek. The sampling identified discharges of multiple pollutants either unpermitted or exceeding the permitted effluent limit. These discharges included 25.6 mg/liter of Iron (in excess of the effluent limit of 7 mg/L), 1.6 ug/liter of 1, 2, 4 trimethylbenzene, 1.1 ug/liter of Toluene, 0.058 mg/liter of Cobalt, and 2.8 mg/liter of Boron.

82.    On May 13, 2022, the Riverkeeper sampled immediately downstream of the Facility's outfalls, identifying unpermitted discharges of 0.8 mg/liter of

Boron and 1.9 mg/liter of Nitrate. These pollutants were not detected in Codorus Creek on the same day upstream of the Facility and it is likely these unpermitted pollutants entered Codorus Creek from outfalls at the Facility.

83.    Additionally, on May 13, 2022, the Riverkeeper sampled a permitted discharge pipe from the Facility that was actively discharging into Codorus Creek and identified discharges of multiple pollutants either unpermitted or exceeding the permitted effluent limit. These discharges included 13.9 mg/liter of Iron (in excess of the effluent limit of 7 mg/L), 9.3 mg/liter of Boron, and 0.44 mg/liter of Lithium.

84.    That same day, the Riverkeeper also sampled the discharge coming from what is believed to be an unpermitted pipe at the Facility. All discharges from this pipe are unpermitted discharges. The discharges included: 0.35 mg/L of Aluminum, 23.2 mg/L of Boron, 0.0066 mg/L of Cadmium, 0.019 mg/L of Chromium, 7.0 mg/L of Iron, 0.066 mg/L of Lead, 1.1 mg/L of Lithium, 0.86 mg/L of Manganese, 0.037 mg/L of Nickel, and 236 ug/L of Gasoline Range Organics.

85.    On January 6, 2023, the Riverkeeper sampled the discharge coming from an unpermitted outfall pipe at the Facility. This sampling identified multiple unpermitted pollutants entering Codorus Creek, including 2.7 mg/L of Aluminum, 3.2 mg/L of Boron, 0.0070 mg/L of Cadmium, 0.030 mg/L of Chromium, 22.4

mg/L of Iron, 0.34 mg/L of Lead, 0.78 mg/L of Manganese, 0.036 mg/L of Nickel, 0.00056 mg/L of Mercury, and 0.0080 mg/L of Arsenic.

86.    On October 3, 2024, the Riverkeeper sampled the discharge coming from an unpermitted outfall at the Facility. This sampling identified multiple unpermitted pollutants entering Codorus Creek, including 5.6 mg/L of Iron, 0.0070 mg/L of Lead, 3.6 mg/L of Manganese, 0.010 mg/L of Nickel, 0.086 mg/L of Lithium, 0.0018 mg/L of Arsenic, and a total PFAS concentration of 53.8 ppt.

87.    As described above, effluent from the Facility is discharging to Codorus Creek from unpermitted sources, including the outfalls, at the Facility, and unpermitted pollutants are being discharged from the Facility to Codorus Creek. The Riverkeeper's sampling also identified instances where pollution levels in Codorus Creek immediately downstream from the Facility's outfalls were above the limits in the Facility's expired Permit.

88.    During sampling events the Riverkeeper also observed sheet flow bypassing the Facility's stormwater controls, running off the property, and entering Codorus Creek.

***Nonreporting***

89.    Defendant's Permit contains additional requirements along with those limiting the types and amounts of pollutant discharges.

90.    Part A of the Permit contains conditions requiring J&K Salvage to monitor, sample, and report on the four outfalls at the Facility. PADEP inspection reports indicate that outfalls 002, 003, and 004 have not been sampled and reported by Defendant in compliance with Part A of the expired Permit since at least 2022.

91.    Part C.V. of the expired Permit requires Defendant to conduct stormwater sampling of discharges at the Facility resulting from storm events of greater than 0.1 inch in magnitude. This stormwater sampling must be documented in annual reports as required by Part A.III.C.1 of the expired Permit.

92.    The annual reports submitted by the Facility for 2023 and 2024 only document two qualifying storm events. A review of rainfall data from the closest rain gauge to the Facility[6] indicates that from 2022 to 2024 there were 210 days with rainfall events greater than 0.1 inches. Based on this information, and the fact that in 2023 and 2024 the Facility only reported a total of four rain events greater than 0.1 inches, it is likely that the Facility has repeatedly and continuously failed to conduct and report the required stormwater sampling for rain events of 0.1 inches of rain or greater.

93.    Without adequate monitoring, the Facility, the regulators, and the public will be deprived of the information necessary to determine whether corrective actions must be taken to reduce pollution to the nearby creek, thus likely

---

[6] *Climate Data Online*, National Centers for Environmental Information, https://www.ncdc.noaa.gov/cdo-web/ (last visited Jan. 29, 2025).

increasing the amount of such pollution to beyond what would be lawfully permitted.

*Facility Operation, Management, and Adverse Impact*

94.    Defendant's expired Permit also contains requirements that ensure proper operation and maintenance of the Facility and management of any adverse impacts the Facility might have on human health or the environment.

95.    Part B.I.D. of the expired Permit requires the Facility to be operated and maintained properly to achieve compliance with the terms and conditions of the Permit.

96.    By continually discharging unpermitted pollutants and exceeding the effluent limits of the permitted pollutants, the Facility is in violation of this requirement.

97.    Part B.I.E. of the expired Permit requires that the Facility "take all reasonable steps to minimize or prevent any discharge in violation of t[he] [P]ermit that has a reasonable likelihood of adversely affecting human health or the environment."

98.    The Riverkeeper's sampling indicates that unpermitted metal pollutants are being discharged from the Facility and that there is likely an unpermitted discharge pipe. These unpermitted discharges and pollutants have a reasonable likelihood of adversely affecting human health or the environment and

the Facility has continuously failed to prevent or minimize these unpermitted discharges of pollution to Codorus Creek.

*RCRA*

99.    J&K Salvage accepts and processes a variety of materials, including vehicle batteries, electronic waste, and toxic heavy metals such as lead.[7] The Facility not only stores materials, but can also shred them, inviting individuals to drop off their used and contaminated scrap in exchange for a bargain price.[8]

100.    Based on information and belief, the Facility does not have a RCRA solid or hazardous waste management permit.

101.    J&K Salvage has contributed to the handling of solid waste by processing automobiles, yard and woody waste, shingles, construction and demolition waste, and other wastes.

102.    J&K Salvage advertises storage of various materials that meet RCRA's definition of solid waste. PADEP inspections revealed several forms of waste/material storage at the Facility, including storage of construction and demolition waste, scrap and metal piles, an autofluff pile, and whole metal objects.

103.    J&K Salvage has contributed to the disposal of solid waste by discharging, depositing, leaking, and placing solid waste into Codorus Creek, the

---

[7] *Materials*, J&K Salvage Home Page, https://salvage.jksalvageco.com/materials/ (last visited July 8, 2025).
[8] *Id.*

Unnamed Tributary, and the soil and wetlands adjacent to the Facility so that such solid waste and constituents thereof may enter the environment, including the Unnamed Tributary and Codorus Creek.

104.  J&K Salvage contributes to treatment of solid waste by processing and shredding metals and other materials.

105.  The Facility had a PADEP solid waste permit, General Waste Permit–WMGR138-SC001 ("Solid Waste Permit").

106.  J&K Salvage has a history of noncompliance with its Solid Waste Permit. On July 27, 2017, PADEP revoked the Facility's General Waste Permit. J&K Salvage appealed the revocation, resulting in a Consent Order and Agreement between PADEP, J&K Salvage, and others on October 23, 2018. The Consent Order and Agreement directed J&K Salvage to, among other things, stop accepting and processing any wastes previously specified under the revoked permit. The Consent Order and Agreement also directed the Facility to remove all waste streams.

107.  On July 2, 2021, PADEP and J&K Salvage entered into another agreement, a Stipulation and Order, in which the parties agreed that the Facility would cease "accepting and/or processing yard and woody waste, shingles, construction and demolition waste, and any other wastes previously specified in

[J&K Salvage's] revoked coverage for the Site under the Waste Permit."[9]  Further, the parties agreed that the Facility would "no later than July 30, 2021, [remove] the remaining construction and demolition waste on the Site. . . ."[10]

108.   On August 11, 2021, PADEP conducted a follow up inspection of the Facility. This inspection led to a report with 21 violations of various Pennsylvania statutes, federal statutes, and the Stipulation and Order. The corrective actions included addressing "releases of waste oil, petroleum substances, automotive fluids, leachate, contaminated run-off, and other liquids to the ground and/or surface waters at the facility," and "tak[ing] measures to control and abate contamination of surface water runoff at the facility." This meant that "surface water runoff from waste/material storage areas and run on to waste/material storage areas should be minimized and/or collected and managed in accordance with the Clean Streams Law and NPDES Permit No. PAS603505."

109.   On April 10, 2024, PADEP inspected the Facility and noted violations including petroleum sheens in multiple locations with potential to reach the Unnamed Tributary of Codorus Creek. Petroleum sheen was observed in the shredding area and was originating from a pile of soil mixed with scrap. PADEP also observed that a large pile of autofluff was "actively encroaching on the [U]nnamed [T]ributary." Metal objects, including a car engine, were present in the

---

[9] Stipulation and Order.
[10] *Id.*

Unnamed Tributary. Run-off was observed discharging along the base of the autofluff pile and running toward the northern property line, which faces Codorus Creek.

110.    PADEP further observed, on April 10, 2024, that a pile of metal and other waste was present above Outfall 004. Stormwater flowing via sheet flow from the pile contained a grey tint and biological sheen. There is photographic documentation of Outfall 004 discharging to the bank of Codorus Creek. It also appeared that sheet flow passed through the oil/water separator area of Outfall 001, was overtopping the separator, and flowed toward Codorus Creek. Outfall 001 discharges by pipe onto the streambank and into the Creek. The inspection revealed the presence of metal shavings by Outfall 001's drainage area, from which a sheen originated. Outfall 002 was obstructed by autofluff and was not observed.

111.    Business owners and nearby residents have voiced concerns about the activities taking place at J&K Salvage. There are repeated reports of explosions at the Facility that are sending metal and debris flying from J&K Salvage's shredder into Codorus Creek and neighbors' homes.[11] Some of the metal shrapnel has crashed through windows and roofs, entering nearby homes.[12] One resident has

---

[11] Dylan Segelbaum, *J&K Salvage Shredder Could Kill Someone, Township Argues in Lawsuit for Temporary Shutdown*, York Daily Record (Dec. 9, 2021), https://www.ydr.com/story/news/watchdog/2021/12/09/spring-garden-township-seeks-court-order-immediate-shutdown-industrial-shredder-j-and-k-salvage/6445605001/.
[12] *Id.*

documented hundreds of explosions, which she said occurred as often as twice a week, and sent reports to PADEP.[13] In December of 2021, Spring Garden Township filed a lawsuit against J&K Salvage asking it to cease the operations of the shredder.[14] The lawsuit contains hundreds of pages of exhibits, including police reports and photos.[15]

112.   On February 2, 2022, February 28, 2022, March 3, 2022, May 13, 2022, January 6, 2023, and October 3, 2024, the Plaintiff tested water and/or soil adjacent to the Facility and its discharge pipes. On February 2, 2022, the Riverkeeper sampled Codorus Creek immediately downstream of the Facility's outfalls site as well as water below a permitted discharge pipe that was actively discharging into Codorus Creek. On March 3, 2022, the Riverkeeper sampled a permitted discharge pipe from the Facility that was actively discharging into Codorus Creek. On May 13, 2022, the Riverkeeper sampled immediately downstream of the Facility's outfalls and sampled a permitted discharge pipe from the Facility that was actively discharging into Codorus Creek. Additionally, on May 13, 2022, the Riverkeeper sampled the discharge coming from what is believed to be an unpermitted pipe at the Facility. On January 6, 2023, the Riverkeeper sampled the discharge coming from the unpermitted outfalls pipe at

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

the Facility. On October 3, 2023, the Riverkeeper sampled the discharge coming from the unpermitted outfall at the Facility. Discharge from the outfalls traverses the soil sampled by the Riverkeeper and enters Codorus Creek.

113.    The Riverkeeper identified the following pollutants in the samples, which shall hereafter be referred to as the "J&K RCRA Pollutants" in this complaint: Aluminum, Arsenic, a,a,a-Trifluorotoluene, Benzene, Boron, Cadmium, Chromium, Cobalt, Ethylbenzene, Gasoline Range Organics, Iron, Lead, Lithium, Manganese, Mercury, Naphthalene, Nickel, Nitrate, PFAS, Toluene, Xylenes, and 1,2,4-Trimethylbenzene. When the Riverkeeper sampled Codorus Creek upstream of the Facility, the pollutants identified in the water and soil coming from the outfalls were not detected upstream.

114.    The March 3, 2022 soil sample contained arsenic above PADEP's residential Statewide Health Soil Standards. In 2001, EPA reported that "[a]bout 90% of the arsenic used by industry is currently used for wood preservative

purposes."[16] Arsenic is also used in metal alloys, such as lead alloys.[17] Arsenic "is

extremely mobile in the aquatic environment and cycles through the water column,

sediments and biota."[18] It also bioaccumulates in fish.[19] Studies link inorganic

arsenic ingestion to various cancers as well as negative cardiovascular, pulmonary,

immunological, neurological, and endocrine effects.[20]

---

[16] *Technical Fact Sheet: Final Rule for Arsenic in Drinking Water* 2 (2001), U.S. Environmental Protection Agency, https://nepis.epa.gov/Exe/ZyNET .exe/20001XXE.TXT?ZyActionD=ZyDocument&Client=EPA&Index=2000+Thru +2005&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n& Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFi eldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20 Data%5C00thru05%5CTxt%5C00000001%5C20001XXE.txt&User=ANONYMO US&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&Fuzz yDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefS eekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20p age&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL (last visited Jun. 11, 2025).

[17] *Id.*

[18] *Water-Related Environmental Fate of 129 Priority Pollutants* 6-1 (1979), U.S. Environmental Protection Agency, https://nepis.epa.gov/Exe/ZyNET .exe/P100K7FH.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1976+Thru +1980&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n& Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFi eldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20 Data%5C76thru80%5CTxt%5C00000033%5CP100K7FH.txt&User=ANONYMO US&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&Fuzz yDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefS eekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20p age&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL (last visited Jun. 11, 2025).

[19] *Id.* at 6–7.

[20] *Technical Fact Sheet: Final Rule for Arsenic in Drinking Water*, *supra* note 31, at 2.

115.   Arsenic can also damage ecosystems. A study found that "[c]hronic exposure to low-level [arsenic] contamination can have a profound effect on the phytoplankton community [in the Chesapeake Bay], with resultant alterations affecting the survival of higher trophic levels."[21]

116.   The May 13, 2022 sample, which was collected from outfall 001, exceeded PA State Water Quality Standards for Boron, Cadmium, Iron, and Lead. Ingested Cadmium "causes nausea, vomiting, diarrhea, abdominal pain and tenesmus . . . [p]rotracted absorption of cadmium has led to [renal damage], anemia, [liver injury] and [defective bone structure] in chronically exposed persons."[22] Lead is known to cause a range of health effects, including damage to the brain and nervous system, seizures, reproductive problems, high blood pressure, hypertension, and death.[23]

117.   Additionally, on December 3, 2022, March 24, 2023, October 18, 2023, March 9, 2024 and May 22, 2024, PADEP collected samples at Outfall 001, and various metals and volatile organics were detected.

---

[21] James Sanders & Stephen Cibik, *Response of Chesapeake Bay Phytoplankton Communities to Low Levels of Toxic Substances*, 19 Marine Pollution Bulletin 439, 443 (1988).
[22] James R. Roberts & J. Routt Reigart, *Recognition and Management of Pesticide Poisonings* 155 (6th ed. 2013).
[23] *What are Some of the Health Effects of Lead?*, U.S. Environmental Protection Agency (Jan. 13, 2025), https://www.epa.gov/lead/what-are-some-health-effects-lead.

118.   It is likely that the J&K RCRA Pollutants originate from the Facility and through various processes are being deposited, disposed of, or otherwise coming into contact with and contaminating Codorus Creek, the Unnamed Tributary, and soil and wetlands that are adjacent to the Facility.

119.   The J&K Salvage property shares its location with other entities, including American Rock Salt Co LLC, but those facilities do not engage in metal recycling.

## CAUSES OF ACTION

120.   Plaintiff realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1-119, inclusive.

## COUNT I

**Violations of the Clean Water Act 33 U.S.C.  §§ 1311 and 1342**

**(Unauthorized Discharges of Pollutants to Waters of the United States)**

121.   Plaintiff realleges and incorporates by reference all of the allegations of all preceding paragraphs.

122.   On information and belief, Defendant discharged and continues to discharge pollutants into Codorus Creek and an unnamed tributary of Codorus Creek via an unpermitted and unauthorized PVC pipe.

123.   As a result of unpermitted discharges to Codorus Creek, Defendant violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and

1342, which prohibit the "discharge of pollutants" except in compliance with conditions of a NPDES permit.

124.    Defendant violated the Clean Water Act, 33 U.S.C. §§ 1311 and 1342, by discharging unauthorized pollutants into Codorus Creek from an unpermitted PVC pipe on at least three separate occasions. On these occasions, effluent from the unpermitted PVC pipe contained the following pollutants: Aluminum, Arsenic, Boron, Cadmium, Chromium, Gasoline Range Organics, Iron, Lead, Lithium, Manganese, Mercury Nickel, and PFAS.

125.    On information and belief, Defendant also violated the Clean Water Act, 33 U.S.C. §§ 1311 and 1342, by discharging unauthorized pollutants into Codorus Creek on at least four separate occasions through permitted outfalls 001, 002, 003, and 004. On these occasions, effluent from the permitted outfalls discharged the following unpermitted pollutants: Arsenic, Boron, Cobalt, Lithium, Nitrate, 1, 2,4 trimethylbenzene, and Toluene.

126.    On information and belief, the violations described in this complaint are ongoing and continuous, and unless enjoined by an order of the Court, these violations of the Clean Water Act are likely to continue.

127.    These unpermitted discharges are illegal and constitute violations of the Clean Water Act. Section 505(a)(1)(A) of the CWA, 33 U.S.C. § 1365(a)(1)(A),

entitles citizens to bring suit against "any person...alleged to be in violation" of an "effluent standard or limitation" established under the CWA.

128.   The CWA provides that any person who violates, *inter alia,* Section 301 of the Act, 33 U.S.C. § 1311, or who violates any condition or limitation of a NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, shall be subject to a civil penalty of up to $68,445 per day per violation occurring on or after November 2, 2015, where penalties are assessed on or after January 6, 2023. 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4 (Table 1 – Civil Monetary Penalty Inflation Adjustments).

## COUNT II

### Violation of Clean Water Act 33 U.S.C. §§ 1311 and 1342

### (Failure to Comply with NPDES Permit Conditions)

129.   Plaintiff realleges and incorporates by reference all of the allegations of paragraphs 1-129.

130.   The expired Permit established effluent limits detailed at Paragraph 64 above.

131.   Defendant exceeded Permit limits for dissolved Iron from permitted outfalls at least three times since February 2022.

132.   Defendant also discharged pollutants detailed at Paragraphs 79-86 above, which are not included within the parameters of authorized pollutants set forth in the expired Permit.

133.   DEP inspection reports indicate that Outfalls 002, 003, and 004 have not been sampled and reported in compliance with Part A of the expired Permit from at least 2022 to the present.

134.   Defendant violated and is violating Sections 301 and 402 of the CWA, 33 U.S.C. §§ 1311 and 1342, which prohibits the "discharge of pollutants" except in compliance with conditions of a NPDES permit by exceeding Permit limits for dissolved Iron and by failing to properly monitor, sample, and record data from each outfall.

135.   Based on information and belief, Defendant has not complied with Conditions A, A.III.C.1, B.I.D. and B.I.E. of the expired Permit.

136.   Defendant has not complied with Condition A by failing to monitor, sample, and report on four outfalls at the Facility.

137.   Defendant has not complied with Condition A.III.C.1 of the expired Permit by failing to conduct stormwater sampling of discharges at the Facility resulting from storm events of greater than 0.1 inch in magnitude and failing to document said sampling in Annual Reports.

138.  Defendant has not complied with Condition B.I.D. by failing to comply with the proper operation and maintenance terms and conditions of the expired Permit.

139.  Defendant has not complied with Condition B.I.E. of the expired Permit by failing to "take all reasonable steps to minimize or prevent any discharge in violation of t[he] [P]ermit that has a reasonable likelihood of adversely affecting human health or the environment."

140.  The Facility's unpermitted discharges and pollutants have a reasonable likelihood of adversely affecting human health or the environment and the Facility has continuously failed to prevent or minimize these unpermitted discharges of pollution to Codorus Creek.

141.  Each day that Defendant fails or has failed to comply with any Permit condition is a separate violation of the Clean Water Act for which a penalty up to $68,445 can be assessed. 33. U.S.C. § 1319(d).

## COUNT III

### Violations of the Pennsylvania Clean Streams Law 35 P.S. §§ 691.1 *et seq*

142.  Plaintiff realleges and incorporates by reference all of the allegations of paragraphs 1-142.

143.  The Clean Streams Law prohibits the unauthorized discharge of pollutants to waters of the State.

144.    Defendant fails to comply with the Clean Streams Law, 35 P.S. § 691.1 *et seq.*, through its continued violations of its expired Permit via unauthorized and unpermitted discharge of pollutants beginning in February 2022.

## COUNT IV

### Violations of RCRA, 42 U.S.C. § 6972(a)(1)(B)

### (Improper Handling, Storage, and/or Disposal of Pollutants Causing an Imminent and Substantial Endangerment)

145.    Plaintiff realleges and incorporates by reference all of the allegations of paragraphs 1-145.

146.    The citizen suit provision of RCRA authorizes any person to commence a civil action against any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B).

147.    Defendant has contributed and is contributing to the handling, storage, treatment, and disposal of solid or hazardous waste at the Facility which may present an imminent and substantial endangerment to health or the environment in violation of RCRA, 42 U.S.C. § 6972(a)(1)(B).

148.    The J&K RCRA Pollutants meet the RCRA definition of "solid waste."

149. The Facility is likely the source of the J&K RCRA Pollutants that have been detected in Codorus Creek, the Unnamed Tributary, and the soil and wetlands immediately adjacent to the Facility.

150. The J&K RCRA Pollutants have entered and are entering Codorus Creek, the Unnamed Tributary, and the soil and wetlands adjacent to the Facility through four permitted outfalls and an unpermitted PVC pipe, as well as via uncontained material piles, waste streams, petroleum sheen, sheet flow, contaminated surface water runoff, effluent overflow during rainstorms, and explosions in the shredder.

151. Based on information and belief, there are likely no other potential sources of the J&K RCRA Pollutants in Codorus Creek, the Unnamed Tributary, and the soil and wetlands sampled adjacent to the Facility.

152. The J&K RCRA Pollutants entering Codorus Creek, the Unnamed Tributary, and the soil and wetlands adjacent to the Facility may present an imminent and substantial endangerment to health and the environment as that term is defined in Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B). The fact that the samples taken on March 3, 2022 and May 13, 2022 contained Arsenic, Boron, Cadmium, Iron, and Lead levels above Pennsylvania statewide standards is *de facto* evidence that these pollutants may present an imminent and substantial endangerment to health and the environment. Some of the J&K RCRA Pollutants,

like Arsenic, can cause disease, such as cancer, in humans. The J&K RCRA Pollutants endanger the health of people who fish, obtain food from, and recreate in Codorus Creek and the Lower Susquehanna River. The J&K RCRA Pollutants also endanger the aquatic life in Codorus Creek and the Lower Susquehanna River.

153.   On information and belief, the violations described in this Complaint are ongoing and continuous, and unless enjoined by an order of the Court, violations of the RCRA are likely to continue.

154.   Each day the endangerment condition is not halted is a separate daily violation of RCRA for which a maximum penalty of $124,426 per day per violation can be assessed. 42 U.S.C. §§ 6972(a), 6928(a) and (g).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to:

1.  Declare that the Defendant is in violation of the CWA and implementing regulations, the expired Permit, the Pennsylvania Clean Streams Law, and RCRA;

2.  Enjoin Defendant from further violating CWA and implementing regulations, the expired Permit, the Pennsylvania Clean Streams Law, and RCRA;

3.  Order Defendant to:

a.  Immediately comply with all legal requirements including CWA,
    Permit terms and conditions, the Pennsylvania Clean Streams Law,
    and RCRA;

b.  Assess and remediate the harm caused by its violations of CWA and
    implementing regulations, the expired Permit, the Pennsylvania Clean
    Streams Law, and RCRA; including but not limited to the following:

    i.   Placing all of the exposed scrap metal and other waste piles on
         the Facility in closed, impermeable containers;

    ii.  Preventing the J&K RCRA Pollutants from reaching the
         Unnamed Tributary, Codorus Creek, and the soil and wetlands
         adjacent to the Facility;

    iii. Removing any scrap metal and other manmade materials from
         the Unnamed Tributary;

    iv.  Conducting a prompt and complete investigation and
         identification of all contamination emanating from the Facility;
         and

    v.   Abating any contamination that could lead to further pollution
         of the Unnamed Tributary and Codorus Creek.

4.  Assess any appropriate civil penalties against the Defendant and/or require environmental projects to benefit the residents in areas impacted by pollution violations;

5.  Award Plaintiff the cost of litigation, including reasonable attorney's fees, costs, expert fees and expenses, past response costs, and future compliance response costs;

6.  Retain jurisdiction until Defendant has fulfilled all legal and Court-ordered obligations; and

7.  Grant such further relief as the Court deems just and proper.

Dated: July 14, 2025

Respectfully submitted,

_____*/s/ David Reed*_____
David Reed - ID No. 314329
Chesapeake Legal Alliance
1212 West Street
Annapolis, MD 21401
Telephone: (202) 253-5560
Email: david@chesapeakelegal.org

*Attorney for Plaintiff*